Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Milton I. Shadur | Sitting Judge If Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 2110 | **DATE** | 3/31/2003 |
| **CASE TITLE** | In Re: Comdisco Securities Litigation | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
  ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] **ENTER MEMORANDUM OPINION AND ORDER.** Motion to dismiss is denied, and Pontikes and Vosicky are ordered to file an answer to the Complaint in this Court's chambers (with a copy of course to be delivered to class counsel) on or before 4/17/03. This action is set for a status at 8:45am on 4/21/03 to discuss the establishment of a plan to move the case forward to as expeditious a trial as possible.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | 6 number of notices | Document Number |
| | No notices required. | | |
| ✓ | Notices mailed by judge's staff. | APR 0 1 2003 date docketed | |
| | Notified counsel by telephone. | | |
| | Docketing to mail notices. | | |
| | Mail AO 450 form. | docketing deputy initials | |
| | Copy to judge/magistrate judge. | 3/31/2003 date mailed notice | |
| JD | courtroom deputy's initials | JD mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

In re                                  )
                                       )   No. 01 C 2110
COMDISCO SECURITIES LITIGATION         )
                                       )
                                       )

MEMORANDUM OPINION AND ORDER

With Comdisco, Inc. ("Comdisco") having vanished as a potential defendant in consequence of its bankruptcy,[1] counsel for the proposed plaintiff class have tendered an Amended Class Action Complaint for Violations of the Federal Securities Laws ("Complaint") against individual defendants Nicholas Pontikes ("Pontikes") and John Vosicky ("Vosicky"). Pontikes and Vosicky have in turn moved to dismiss the Complaint, and the parties have submitted bulky memoranda (and, on the part of Pontikes and Vosicky, far bulkier exhibits) to address the issues.

But the answer to the question of the Complaint's legal sustainability in Fed.R.Civ.P. ("Rule") 12(b)(6) terms can be stated far more simply than the volume of the litigants' input would suggest. As briefly summarized in the Introduction to

---

[1] This Court has heretofore sought to be circumspect in not responding (in kind or otherwise) to the ill-considered (and unfortunately ill-mannered) handling by the former Bankruptcy Judge of the sensible and non-intrusive partial modification of the bankruptcy stay that had been sought to permit a test of the potential facial viability of a like complaint against Comdisco (which could of course have been pursued only upon its emergence from bankruptcy) as well as against Pontikes and Vosicky. Despite the regrettable and extensive delay that was caused by the needless rejection of that effort, nothing other than this footnote will be said on the subject.



their Reply and Memorandum ("R. Mem."), Pontikes and Vosicky assert (emphasis in original):

> In this case, when the Court looks at everything Comdisco said about Prism[2] during the purported class period, it becomes clear that investors would not have been misled about what Prism had already achieved or what it hoped to achieve in the future.

That contention does not adequately credit, as this Court must for Rule 12(b)(6) purposes, the well-pleaded allegations of the Complaint.[3] Those allegations plainly entitle the class to stay in court as having advanced a viable complaint against Pontikes and Vosicky for violation of the securities laws.

Indeed, it is worth adding a point that is not sufficiently remarked in the case law in situations where the effect of the material misrepresentations or material omissions, which form the gravamen of the securities law claims, itself provides further confirmation of the sustainability of such claims. In that respect counsel for Pontikes and Vosicky have essentially urged the "total mix" approach first articulated in TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976) -- as R.Mem. 3-4

---

[2] [Footnote by this Court] Prism was the ultimately ill-fated venture whose collapse was a major (but by no means the only) factor in Comdisco's ultimately being brought to its knees.

[3] In lieu of providing its own summary of those allegations, this opinion simply attaches class counsel's accurate summary, as set forth at their Mem. 4-7 directed to the current motion. Because class counsel's Preliminary Statement at their Mem. 1-3 also provides an accurate analysis of the legal effect of those allegations in the current Rule 12(b)(6) context, that Preliminary Statement is attached as well.

2

(emphasis in original) puts it:

> The fraud-on-the-market doctrine assumes that the market will absorb all publicly-available information about the price of a widely-traded stock.

But if that is really so -- if the market here (that is, the universe of investors and perspective investors) really processed all of the information about Prism that Comdisco was putting out, both good and bad, in pegging the price of Comdisco stock at all times -- it is difficult to understand why the revelation of the news about Comdisco's giving up on the Prism venture should have caused such a major and precipitate drop in the stock price if, as Pontikes and Vosicky would have it, their earlier and assertedly accurate statements should have prepared the investing public for the reality that "something is rotten in the state of Prism."[4] In an important sense, the Pontikes-Vosicky arguments about the omniscience of the market and market forces really undercut what they now attempt to urge on this Court.

This is not a matter of arguing from results -- of post hoc ergo propter hoc. It is rather that the contentions put forth by Pontikes and Vosicky -- that Comdisco's representations about Prism, about how well it was doing and would do in the future, were no more than mere puffery readily recognizable as such by the market, and that the purported "safe harbor" hedges operated to prevent investor deception in that respect -- really do not

---

[4] Cf. William Shakespeare, Hamlet act I, sc.4, line 90.

withstand analysis.

This Court has examined the parties' arguments with care. Class counsel have provided a powerful memorandum that delivers an effective point-by-point response to the Pontikes-Vosicky attack. It graphically demonstrates that the Complaint more than suffices to state a claim with the level of particularity required by the securities law.

There is consequently no need to reinvent the wheel here. Simply put, the motion to dismiss is denied, and Pontikes and Vosicky are ordered to file an answer to the Complaint in this Court's chambers (with a copy of course to be delivered to class counsel) on or before April 17, 2003. This action is set for a status hearing at 8:45 a.m. April 21, 2003 to discuss the establishment of a plan to move the case forward to as expeditious a trial as possible.

                                              Milton I. Shadur
                                              Senior United States District Judge

Date: March 31, 2003

4

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| IN RE COMDISCO SECURITIES LITIGATION | Master File No. 01 C 2110<br><br>Judge Milton I. Shadur |

PLAINTIFFS' MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANTS' MOTION TO
DISMISS THE AMENDED CLASS ACTION COMPLAINT

Plaintiffs respectfully submit this memorandum of law in opposition to defendants Nicholas K. Pontikes' and John J. Vosicky's motion to dismiss the Amended Class Action Complaint for Violation of the Federal Securities Laws (the "Complaint").[1]

I. PRELIMINARY STATEMENT[2]

This case involves a fraud implemented by defendants to deceive purchasers of Comdisco[3] (the "Company") common stock. As set forth in the Complaint, between November

---

[1] Citations to the Complaint are referenced as "¶ ____."

[2] As an initial matter, defendants' assertion that "plaintiffs could have proceeded without delay against the two individual defendants, [but] chose not to do so," *Defendants' Memorandum in Support of Their Motion to Dismiss the Amended Class Action Complaint* ("*Defs. Mem.*") at 2, is a gross distortion of the record. At the July 17, 2001 status hearing, plaintiffs, in light of Comdisco, Inc.'s ("Comdisco" or the "Company") pending Chapter 11 bankruptcy reorganization proceedings, sought leave to file their Amended Complaint solely against individual defendants Pontikes and Vosicky. This Court denied plaintiffs' request and instructed plaintiffs' counsel to move the bankruptcy court overseeing Comdisco's Chapter 11 bankruptcy reorganization proceedings for a partial modification of the automatic stay, pursuant to 11 U.S.C. § 362, to enable this Court to adjudicate a single set of challenges to the sufficiency of any amended complaint plaintiffs would file against all defendants. Subsequent motion practice in the bankruptcy court with respect to the stay modification issue (which motion was ultimately denied), and arising out of plaintiffs' opposition to Comdisco's bankruptcy counsel's efforts to release plaintiffs' securities fraud claims against defendants Pontikes and Vosicky (which resulted in an agreement that such claims would not be released) ended in mid-2002. Plaintiffs moved this Court for leave to file their Complaint soon thereafter.

[3] By virtue of its bankruptcy filing and by agreement (see footnote 2, above), Comdisco is not named as a defendant in this case and plaintiffs are pursuing their claims only against defendants Pontikes and Vosicky. ¶ 1.

3, 1999 and October 3, 2000, defendants -- individually and as controlling persons of Comdisco,[4] as well as other Comdisco officers and directors, repeatedly misrepresented Comdisco's financial condition, business activities, and prospects, particularly with respect to its wholly-owned subsidiary Prism Communications Services ("Prism"). Defendants, individually and as controlling persons of Comdisco, made a series of materially false and misleading statements and omissions about Comdisco's business dealings, intentions, and prospects with respect to Prism, the center of Comdisco's purported recasting of itself as a cutting edge Internet company and a major player in the Internet "revolution." ¶ 2.

Throughout the Class Period, defendants falsely and repeatedly highlighted Prism's purported position as, *inter alia*, a "market leader," ¶ 56, and a "leading integrated communications provider," ¶ 57, and further promoted Comdisco's purported ability to cross-sell Prism's services to its existing customers. Defendants did so with full knowledge that Prism had virtually no market share, was losing the few customers it did have, and that Comdisco's existing customers had no desire to acquire DSL lines from Prism or to subscribe to any of Prism's services and that Comdisco, in fact, was losing existing customers as a result of its efforts to saddle them with unwanted Prism services. ¶¶ 3, 48-49, 54, 57-58.

Defendants were highly motivated to overstate Prism's value and operations and to conceal the complete failure of the acquisition. Defendants repeatedly hyped their purported plans to spin Prism off in an initial public offering ("IPO"), despite their awareness throughout the Class Period that Prism was not viable, in an effort to shed Prism before the investing public learned of its shortcomings. ¶¶ 3, 4, 55. When they finally announced the inevitable cancellation of the Prism IPO plans, defendants continued to misrepresent the facts and withheld

---

[4] For the reasons set forth below, Comdisco's complete ownership and utter domination and control of Prism during the time period relevant to this litigation render defendants liable for Prism's false and misleading statements and omissions during this time period as well. *See, e.g.*, ¶¶ 36, 37, 42-44.

their plan to shut down Prism until Comdisco was able to close its then-pending offering of $500 million of its notes (the "Note Offering"). ¶¶ 4-5, 74-81. On October 3, 2000, having closed the Note Offering and thus having milked the last possible benefits from the Prism hype, defendants revealed Comdisco's plans to shut Prism down, causing an immediate downgrade of Comdisco's bond rating and causing its stock price to slide more than 24% on that day -- and more than 77% from its Class Period high. ¶¶ 5-6, 85-88.

The Complaint properly pleads, with great detail, that during the Class Period, the defendants knowingly issued materially false and misleading statements and made material omissions as part of a fraudulent scheme to artificially inflate the price of Comdisco's common stock. Notably, in their motion papers, defendants do not deny that any of the alleged misstatements were made nor that they are specifically alleged to be false. Rather, defendants devote the vast majority of their brief attempting to explain the purported true context of each of their misstatements, or asserting that those statements were immaterial, misconstrued, or mere puffery. Not only do defendants' efforts, at best, raise questions of fact that cannot presently be resolved, but their inability to disclaim any of the alleged misrepresentations speaks volumes. Indeed, defendants' premature factual contentions and unavailing arguments that the Complaint does not sufficiently connect them to the false and misleading statements alleged, cannot sustain their heavy burden on a motion to dismiss, and thus, their motion should be denied.

## II. SUMMARY OF THE FACTUAL ALLEGATIONS OF THE COMPLAINT

Comdisco was a leader in the business of leasing computer systems and mainframes. ¶ 27. In January 1999, Comdisco announced that it was moving away from these traditional core businesses to focus on "next-generation technologies," such as the provision of broadband services and equipment. ¶¶ 32-33. This repositioning of the company away from the business segments that had brought it success since its inception in 1969 was driven by defendant Nicholas Pontikes, the son of Ken Pontikes, Comdisco's founder. ¶ 31. Nicholas Pontikes, Ken's designated heir, had little exposure to the basic business of the Company. ¶¶ 28, 29. His background was in investment banking and junk bond trading. ¶ 29. As one financial expert put it, he was primarily oriented toward "packaging his company to fit the buzz." ¶ 30 (quoting Professor James Schrager of the Chicago School of Business).

The acquisition of Prism was a key element of Comdisco's transition to a "new age company" ¶ 33. This acquisition cost Comdisco more than $125 million (and, ultimately, more than $478 million, ¶ 86), for which it received nothing more than a start-up telecommunications company with little infrastructure, almost no customers, and virtually no management. ¶38. Despite these facts, Comdisco represented Prism as one of its core business divisions, ¶ 32, and set about to convince the investing public that it represented Comdisco's future.

At all times relevant to this action, Comdisco completely controlled Prism. According to a former Prism Director of Operations and Director of Information Technologies, "Comdisco took [Prism] over and ran it the way they wanted." ¶ 44. Indeed, following its acquisition, Prism's operations were overseen by Comdisco employees and did not have independent leadership, including a CEO. ¶ 43, 44.

Through Comdisco's acquisition of this barely established company, defendants sought to hype Comdisco stock, convincing the market that Comdisco was a powerful figure in the new

"Internet Age." ¶39. While praising Prism as offering "a unique opportunity to offer customers the best technology infrastructure solutions," and proclaiming the symbiotic connection between Comdisco's existing customers and the new Prism endeavors, defendants concealed the fact that Comdisco's existing customers were uniformly rejecting Prism's services. ¶¶ 40-42, 49. Comdisco made a series of announcements concerning the "expansion" of Prism services into new markets, announcing administrative approvals in various states and cities for the roll-out of its "RED DSL service." ¶¶ 50, 55, 63, 64, 71. Defendants, however, failed to disclose that Prism was unable to provide service in these new markets, was not signing up substantial numbers of new customers in its already existing market areas, and could not provide the promised services to the few customers that it did have. ¶ 50. For example, Comdisco publicly represented that, in the New York market, there was "overwhelming interest and support for RED," despite the fact that at the time, Prism had less than 2,000 customers in all of its markets combined. ¶ 54 (quoting February 17, 2000 statement of Dennis Kruse, Prism's chief marketing officer).

Defendants' plan to salvage Comdisco's investment in Prism was, from at least as early as November 1999, the beginning of the Class Period, to spin Prism off in an IPO. ¶¶ 4, 43, 44, 47, 55, 57, 60, 64, 68, 72, 93. In connection with this plan, Comdisco sought to generate public "buzz" about Prism's prospects, benefiting Comdisco in the process, while allowing Comdisco to rid itself of Prism before its non-viability and true outlook became publicly known. *Id.* As is apparent from the behavior alleged in the Complaint, defendants were willing to tell the market whatever it needed to hear to prepare it for such an IPO.

Defendants repeatedly issued press releases and other public statements describing Prism as a "leading telecommunications provider" and "on the forefront" of companies in its field. ¶ 62-63. One press release went so far as to state that Prism "dramatically reduces provisioning

time to 5 to 7 days" (despite the fact that their provisioning actually took between 3 and 6 months for each new account, a reality which cost Prism a significant number of customers, according to a former Prism Senior Field Operations Manager). ¶ 68-69. As a result of this increased promotion Comdisco's stock price continued to rise on a wave of artificial inflation, reaching an all time high, on March 10, 2000, of $57.25 (up from $36.25, where it had closed on February 7, 2000, the day that Comdisco announced its retention of Saatchi & Saatchi, the global advertising firm, to promote Prism). ¶ 61-64. Throughout this period, Comdisco insiders sold substantial portions of their personal Comdisco holdings. *See, e.g.*, ¶¶ 61, 66-67, 96. For example, between March 6, 2000 and March 10, 2000, defendant Vosicky alone sold 123,157 shares of his stock, worth more than $5,862,000. ¶ 96.

When they were forced to reveal that their IPO plan could not be realized, defendants still withheld the truth of Prism's condition from the market, instead announcing, on July 26, 2000, that they were determined to look for other "strategic alternatives" for Prism. ¶ 74. Even in disclosing that Comdisco had discarded its plans for a Prism IPO, defendants continued to hide the true condition of Prism's dysfunctional operations and nearly non-existent customer base from the public, ¶ 76; instead Comdisco claimed to be looking for new strategic alternatives even though defendants knew that Comdisco's only alternative would be to terminate Prism's operations entirely, because Prism had no value as a continuing business entity. ¶ 76.

Defendants' motivation for withholding the truth about Prism was to ensure the continued artificial inflation of Comdisco's stock price, as well as permit Comdisco to complete the Note Offering. ¶ 79. The fraud was necessary to the completion of this offering because, pursuant to the terms of the S-3 Registration Statement upon which the note offering was based, "any material adverse change in, or any material development known to management which is likely to result in a material adverse change in the condition, financial or otherwise, of the Company

and its subsidiaries, would prevent the offering from being consummated." ¶ 80. The Note Offering was successfully completed on August 8, 2000. Less than eight weeks later, on October 3, 2000, Comdisco finally revealed the true status of Prism, issuing a press release that it would cease funding of Prism and sell off its assets, charging them against the Company's fourth quarter financial results. ¶ 85.

Immediately after defendants made this belated disclosure, the three top credit rating agencies lowered Comdisco's debt rating. Also in the immediate aftermath, Comdisco's stock price experienced a one day drop in share price of 24% from $17.5625 per share to $13.375 per share. ¶ 88. This lawsuit followed. Within a few months of Comdisco's disclosure concerning Prism, defendant Pontikes resigned as President and CEO of Comdisco, stating that "Comdisco needed a more experienced leader." ¶ 89. On July 16, 2001, Comdisco filed for protection under Chapter 11 of the United States Bankruptcy Code. ¶ 89. Its stock is presently without value, down from a high at the apex of Comdisco's fraudulent hype of $57.25 per share. ¶ 88-89.

## III. ARGUMENT

### A. THE STANDARDS ON A MOTION TO DISMISS

In considering a motion to dismiss, the court must "take all facts alleged in the complaint, and any inferences that might be reasonably drawn from those factual allegations, in the light most favorable to the plaintiff[s]." *Szumny v. American Gen. Fin., Inc.*, 246 F.3d 1065, 1067 (7th Cir. 2001) (citing *Autry v. Northwest Premium Servs.*, 144 F.3d 1037, 1039 (7th Cir. 1998)). The claims averred in the complaint may be dismissed under Rule 12(b)(6) "only if it appears *beyond doubt* that the plaintiff can prove *no set of facts* in support of his [or her] claim which would entitle him [or her] to relief.'" *Lindelow v. Hill*, No. 00 C 3727, 2001 U.S. Dist. Lexis 10301, at *8 (N.D. Ill. July 20, 2001) (J. Holderman) (quoting *Conley v. Gibson*, 355 U.S. 41,