Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Milton I. Shadur | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 2110 | **DATE** | 4/26/2004 |
| **CASE TITLE** | In Re: Comdisco Securities Litigation | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Enter Memorandum Order. In sum, this Court accordingly adheres to the analysis that it had set out more briefly in the Opinion.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | Document Number |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | APR 2 6 2004 | |
| | Notified counsel by telephone. | | date docketed | 80 |
| | Docketing to mail notices. | | docketing deputy initials | |
| | Mail AO 450 form. | U.S. DISTRICT COURT | | |
| | Copy to judge/magistrate judge. | CLERK | 4/26/2004 | |
| | | 2004 APR 26 PM 3:33 | date mailed notice | |
| SN | courtroom deputy's initials | | SN | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

DOCKETED
APR 26 2004

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

In re                              )
                                   )
COMDISCO SECURITIES LITIGATION     )    No. 01 C 2110
                                   )
                                   )

MEMORANDUM OPINION

During the course of the previously scheduled status hearing held in this securities class action earlier this week, counsel for the lead plaintiff appointed by this Court under the Private Securities Litigation Reform Act ("Act")--see the June 27, 2001 opinion reported at 150 F.Supp.2d 943 ("Opinion"), as well as the earlier opinions in this case referred to there--drew to this Court's attention an article by Fred Burnside, Fee-Fi-Fo-Fum: Why the Rejection of FIFO Is...Not Smart, 2 Class Action Litig. Report (BNA) 786 (2001), that criticized this Court's adoption of a LIFO rather than FIFO method in determining an investor's losses during the class period for purposes of identifying the "most adequate plaintiff" as called for by the Act. Under ordinary circumstances this Court would simply leave it at that--after all, criticism of judicial endeavors comes with the territory, and this Court has always been mindful of the teaching of Craig v. Harney, 331 U.S. 367, 376 (1947), which is just as valid today as when it was first written and which applies with equal force to less trenchant criticism and to nonpunitive judicial responses:

This was strong language, intemperate language, and, we assume, an unfair criticism. But a judge may not hold in contempt one "who ventures to publish anything that tends to make him unpopular or to belittle him...." See Craig v. Hecht, 263 U.S. 255, 281, 44 S.Ct. 103, 108, 68 L.Ed. 293, Mr. Justice Holmes dissenting. The vehemence of the language used is not alone the measure of the power to punish for contempt. The fires which it kindles must constitute an imminent, not merely a likely, threat to the administration of justice. The danger must not be remote or even probable; it must immediately imperil.

\*     \*     \*

But the law of contempt is not made for the protection of judges who may be sensitive to the winds of public opinion. Judges are supposed to be men of fortitude, able to thrive in a hardy climate.[1]

But two special circumstances call for different treatment here:

    1. For one thing, class counsel has previously apprised this Court of some serious personal problems that may affect the present class representative's ability to continue in that status, so that this Court's application of the Act's requirements may well be brought into question once again in this action.

    2. Another look at Opinion at 945-46 in light of the Burnside article suggests that this Court may not have elaborated sufficiently in the Opinion as to why the methodology it chose was the correct one.

---

[1] [Footnote by this Court] Indeed, this Court has always kept a copy of Justice Douglas' just-quoted language at hand on the bench.

And although this added factor would not have carried any weight in the absence of those special circumstances, it is also worth noting that the same issue is potentially--and most likely actually--encountered in most if not all lawsuits brought under the Act. Accordingly this follow-up opinion will speak to the basic flaws in the cited article's treatment and will reconfirm this Court's view of the soundness of the approach that it took in the Opinion.

It is entirely appropriate that the article's author chose, as he did, to illustrate his analysis by speaking of green and red apples, for one possible consequence of working with apples may be the production of applesauce--as Webster's Third New Int'l Dictionary (unabridged) 104 defines that product:

> an insincere expression of opinion: an assertion that is patently absurd and usu. phrased in exaggerated terms: BUNK, BALONEY (I know applesauce when I hear it--Ring Lardner).

Just so here, for any real-world analysis of how investors have fared in terms of their transactions in a security during a specified period necessarily first matches their in and out transactions <u>during that period</u>, and hence calls for LIFO rather than FIFO treatment.

There is of course a perfectly respectable place for the use of FIFO in measuring the economic results from stock transactions in other contexts. Thus Reg. §1.1012-1(c)(1) provides for internal revenue purposes:

> If shares of stock...are sold or transferred by a taxpayer who purchased or acquired lots of stock on different dates or at different prices, and the lot from which the stock was sold or transferred cannot be adequately identified, the stock sold or transferred cannot be adequately identified, the stock sold or transferred *shall* be charged against the earliest of such lots purchased or acquired in order to determine the cost or other basis of such stock.

But the reasons for that treatment for income tax purposes are readily apparent: In light of the long-term trend of increasing values in stocks, plus the facts (1) that FIFO rather than LIFO therefore typically increases the measurement of currently recordable gains and (2) that stocks held until death get a stepped-up basis while at the same time escaping income taxation entirely, what other approach might be expected from taxing authorities who are properly interested in maximizing the benefits to the fisc?

By contrast, what this opinion has just referred to as real-world considerations mandate the opposite treatment in identifying what gains or losses have been sustained during a specified period when prices have been artificially inflated by some securities law violation. Consider an Investor A with accumulated holdings of 10,000 shares of XYZ Corporation that were acquired when everything was on the up and up in terms of corporate disclosures, and that represent the investor's long-term commitment to the company's prospects. Assume further that unknown to Investor A but during what later turns out to be a

plaintiffs' class period--a time when the nondisclosure of adverse information caused the stock price to be too high in terms of real value--Investor A both buys and sells an aggregate of 5,000 shares of XYZ stock in various transactions before the stock price later falls out of bed, and that such class-period transactions leave Investor A neither out of pocket nor in pocket when the expenditures for and the proceeds of those transactions are aggregated.

Is there any real question that Investor A, who has thus retained the same long-term stake in XYZ that preceded the class period, has sustained neither gain nor loss <u>from the transactions during the class period</u>? To sharpen the issue even further, is there any question that Investor A is in an economic position identical to that of Investor B, someone who also held 10,000 shares of XYZ before the beginning of what later proved to be the class period, and who didn't trade at all during the class period? Or is there any question that both Investor A and Investor B are in the identical economic position as Investor C, a person who held no XYZ shares before the class period and whose purchases and sales during the class period, each aggregating 5,000 shares, also resulted in a wash in terms of the dollars involved?

Little wonder, then, that an opinion such as <u>In re Olsten Corp. Sec. Litig.</u>, 3 F.Supp.2d 286, 295 (E.D. N.Y. 1998)(emphasis

added)(cited in Opinion at 945-46) speaks of "the number of net shares purchased during the class period" in identifying the "losses during the class period." Unable to deal rationally with that obvious reference to the matching of transactions during the class period, the author of the pro-FIFO article instead attempts an invalid sleight-of-hand distinction--immediately before entering into his invalid red apple-green apple simile--that "you cannot know the number of net shares purchased until you know which shares are considered as being in the net."

Simply put, the article's attempted criticism of the use of LIFO in determining the identity of the "most adequate plaintiff" under the Act impermissibly ignores the obvious fact that with every securities class action having to identify a class period, the focal point of inquiry must begin (for standing purposes and otherwise) with purchases or sales--or both--_during_ that class period. And in turn that focus calls for a primary concentration on class period transactions, which is consistent with LIFO rather than FIFO treatment. Regrettably the cited article, like the source from which it drew its Fee-Fi-Fo-Fum title, is no better than a fairy tale. In sum, this Court accordingly adheres to the analysis that it had set out more briefly in the Opinion.

_____
Milton I. Shadur
Senior United States District Judge

Date: April 26, 2004